People v Brown (2018 NY Slip Op 01173)





People v Brown


2018 NY Slip Op 01173


Decided on February 20, 2018


Appellate Division, First Department


Richter, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 20, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rosalyn H. Richter, J.P.
Judith J. Gische
Barbara R. Kapnick
Marcy L. Kahn
Cynthia S. Kern, JJ.


971/14 4634 

[*1]The People of the State of New York, Respondent,
v
Darryl Brown, Defendant-Appellant.



Defendant appeals from the judgment of the Supreme Court, Bronx County (Robert A. Neary, J.), rendered November 2, 2016, convicting him, after a jury trial, of manslaughter in the first degree, and imposing sentence.




Kohler & Isaacs, LLP, New York (Joey Jackson of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (Clara H. Salzberg and Justin Braun of counsel), for respondent.



RICHTER, J.P.


In this homicide prosecution, we are asked to determine whether the trial court erred in denying defendant's request to instruct the jury on the defense of justification. We find that, viewing the evidence at trial in the light most favorable to defendant, a jury could conclude that defendant feared for his life, and reasonably believed deadly physical force was necessary to defend himself against the deceased's imminent use of deadly physical force. Under the circumstances here, the court's failure to give the justification charge constitutes reversible error, and the case must be remanded for a new trial.
Defendant Darryl Brown was charged with murder in the second degree, manslaughter in the first degree, and criminal use of a firearm in the first degree, based on allegations that he fatally shot Vonde Cabbagestalk on March 20, 2014. The evidence at trial established the following. On the day of the incident, defendant lived with his daughter in apartment 1B at 739 East 242nd Street in the Bronx. On the afternoon of that day, Yvette Flores, who lived directly across the hall in apartment 1A, heard a loud voice arguing. Flores looked through the peephole [*2]in her door and saw defendant and his daughter, who was holding a child, standing in front of their apartment with a younger man. Flores heard defendant and the younger man arguing, but was unable to hear what they were saying. Flores then saw the two men walk off together toward the direction of the building's lobby and out of her line of sight. Defendant's daughter remained at the apartment door with the child.
Although Flores could no longer see the men after they walked off, she heard them arguing and cursing, but did not hear any specific threats. She heard defendant's daughter yell, "[N]o daddy no," followed immediately by a loud boom. Flores initially moved away from her door, but returned to look through the peephole, where she saw defendant, his daughter and the child go into their apartment. Flores went into the hallway and saw a man lying by the front door of the lobby, motionless, and called 911. Flores testified that she did not see the actual shooting incident and never saw a gun or any other weapon during the encounter.
Raymond Wolf, a postal carrier, was delivering mail to the building that afternoon. Two young men who were standing in the lobby let Wolf in. Wolf, who was listening to music on his headphones, went off to the side of the lobby to place the mail into the mailboxes. At some point, Wolf noticed a shorter, older man enter the lobby area. The older man and the two young men were talking at first, and then the conversation became louder. The older man said, "[W]hy you here," "stay away from my daughter, don't come around here." One of the young men, later identified as the deceased, Vonde Cabbagestalk, responded, "[Y]ou can't tell me where to be." Cabbagestalk was "getting in the older guy's face a little bit," "trying to back him down." The older man stepped back, and the third man restrained Cabbagestalk, telling him to "chill out, relax."
Cabbagestalk started swinging at the older man, trying to hit him in the face. After Cabbagestalk swung "a couple [of] times," Wolf noticed the older man holding a gun "at an angle" by his waist. The gun was not "pointed in [Cabbagestalk's] direction" or "threatening him," but was "[k]ind of by [the older man's] body. The third man stepped away, still trying to calm Cabbagestalk down, asking him to stop advancing toward the older man. Cabbagestalk, however, continued to swing at the older man's face three to four times, using both hands. At the same time, Cabbagestalk was "grabbing" for the gun, saying, "[Y]ou going to pull a gun out, you better use it." Wolf testified that the older man, who was not at all "hyper," "continued to backup" "[a]nd backup," "[a]nd backup" as Cabbagestalk "continued to approach him," "continued to swing at him," and "continue[d] to swipe at the weapon." Wolf described Cabbagestalk as being "about two feet [from] the older [man]," who was "leaning back," "moving from the swings." Although Wolf did not actually see the flash from the gun, he heard a shot ring out and saw Cabbagestalk fall to the floor. Wolf retreated upstairs and called his supervisor.[FN1]
Sheila Thomas, who lived in the building, was returning home from grocery shopping that day. As she approached the interior door to the building, she was holding her groceries and searching for her keys. Thomas heard voices arguing inside, and although she did not hear what they were saying, she could tell it was a disagreement. Looking through the windows of the [*3]foyer door into the building, Thomas saw two men in the lobby. One of the men was older than the other and had "a little weight" on him; the younger man was taller, "probably slender." Thomas observed the older man walking across the lobby away from the younger man, and the younger man following him. Both were walking in the same direction "at a slow pace," about six to seven feet from each other. As the younger man followed the older man, the older man gestured with his hands, but never turned around to face the younger man. Thomas saw nothing in the older man's hands.
Thomas described how the younger man had his hands extended outward from his body, elbows bent at 90 degrees, with his palms facing upward. Based on those gestures, it appeared to Thomas that the younger man was "trying to reason" with the older man. The two men walked across the hallway and out of Thomas's field of vision, continuing to argue. She heard a gunshot from the direction where the men had just walked, saw the younger man fall backwards in front of the door, and heard a woman scream. Thomas fled outside, ran down the block and called 911. Before she heard the gunshot, Thomas did not observe any physical altercation between the men, saw no punches being thrown, and saw no weapons.
When the police arrived, they observed a man lying face down in the lobby with a single shell casing next to him; he was pronounced dead at the scene. During their canvass of the building, the police spoke to Flores, who directed them to defendant's apartment. Defendant let the police inside, where they recovered a semiautomatic Glock pistol in a kitchen drawer. The police later learned that defendant was a New York City corrections officer who legally possessed the gun. Testing revealed that the shell casing found in the lobby had been fired from defendant's gun. The deceased was subsequently identified as Vonde Cabbagestalk, a 21-year-old man who had been dating defendant's daughter.[FN2]
Prior to summations, defendant asked the court to instruct the jury on the defense of justification. The court denied the request, believing that there was no reasonable view of the evidence to support a justification charge. The jury rendered a verdict finding defendant not guilty of murder in the second degree and guilty of manslaughter in the first degree [FN3]. The court sentenced defendant to 18 years in prison. Defendant now appeals, arguing that the court erred in failing to charge the jury on justification [FN4].
A trial court must instruct the jury on the defense of justification where the evidence, [*4]viewed in the light most favorable to the defendant, reasonably supports the defense (People v Padgett, 60 NY2d 142, 144-145 [1983]; People v Gant, 282 AD2d 298, 299 [1st Dept 2001]). "[I]f on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified, the failure to charge the defense constitutes reversible error" (Padgett, 60 NY2d at 145). "Ordinarily, the possibility of the defense would not appear until injected by the defendant. However, the prosecution's case, in and of itself, may raise an issue of fact as to whether the defendant was justified in using force such that his or her conduct was entirely lawful" (People v Singh, 139 AD3d 761, 763 [2d Dept 2016] [internal quotation marks and citation omitted], lv denied 28 NY3d 936 [2016]).
The use of "deadly physical force" upon another person is justified where the defendant "reasonably believes that such other person is using or about to use deadly physical force" (Penal Law § 35.15[2][a]). However, a defendant may not use deadly physical force "if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating" (id.). Nor may a defendant who is the "initial aggressor" use deadly force, with limited exception (Penal Law § 35.15[1][b]). "Penal Law § 35.15 requires a jury to consider both subjective and objective factors in determining whether a defendant's conduct was reasonable" (People v Wesley, 76 NY2d 555, 559 [1990]). Thus, for a defendant to be entitled to a justification charge with respect to the use of deadly physical force, there must be a reasonable view of the evidence: (1) that the defendant actually believed that the use of deadly physical force was necessary to defend himself or herself against the use, or imminent use, of deadly physical force; and (2) that the defendant's belief was reasonable (see Matter of Y.K., 87 NY2d 430, 433-434 [1996]; People v Wesley, 76 NY2d at 559; People v Goetz, 68 NY2d 96, 115 [1986]).
Applying these principles, we conclude that the trial court should have instructed the jury on the defense of justification. The trial evidence, when viewed in the light most favorable to defendant, supports a conclusion that defendant feared for his life, and reasonably believed that deadly physical force was necessary to defend himself against Cabbagestalk's imminent use of deadly physical force. Wolf, the postal carrier, who was the only eyewitness to the actual shooting,[FN5] described an escalating series of aggressive actions and verbal threats made by Cabbagestalk immediately before defendant fired his weapon. Wolf explained that Cabbagestalk was "getting in [defendant's] face" and was "trying to back him down." Cabbagestalk's behavior was aggressive enough for his friend to, albeit unsuccessfully, attempt to restrain him, entreating him to "chill out, relax."
Instead of taking his friend's advice, Cabbagestalk escalated the encounter and began throwing punches at defendant, using both hands, trying to hit defendant in the face. At that point, defendant took his gun out, but held it by his body, not pointed at Cabbagestalk. Undeterred by the weapon, Cabbagestalk continued to swing at defendant multiple times, and at the same time, grabbed for the gun, threatening, "[Y]ou going to pull a gun out, you better use it." Wolf described how defendant continued to "backup" "[a]nd backup," "[a]nd backup," trying to move away from the swings. But Cabbagestalk continued his attack, advancing toward defendant, taking multiple swings at his face, and grabbing for his gun while simultaneously making a statement that could be interpreted as a threat. Cabbagestalk got within two feet of [*5]defendant, and defendant fired the weapon.
Based on Wolf's testimony, a jury could conclude that defendant reasonably believed that Cabbagestalk, who was younger and taller than defendant, and just two feet away, would gain control of defendant's gun (see People v Wesley, 76 NY2d at 559 [determination of reasonableness of the defendant's conduct must be based on the circumstances facing the defendant, including the physical attributes of all those involved in the incident]; Matter of Ismael S., 213 AD2d 169, 172 [1st Dept 1995] [noting the physical and age disparities between the respondent and victim in finding that the presentment agency failed to disprove justification defense]). A jury could also reasonably conclude that Cabbagestalk's statement to defendant — "[Y]ou going to pull a gun out, you better use it" — constituted a threat that if defendant did not use the gun, Cabbagestalk would take the gun and use it to shoot defendant. This is particularly true in light of the evidence that Cabbagestalk was advancing toward defendant, throwing punches at his face, and grabbing for the gun at the same time he made the threat.
Our decision in People v Schwartz (168 AD2d 251 [1st Dept 1990]) is on point. In that case, the defendant testified that while he was holding a gun in an apartment, a man lunged at him and grabbed for the weapon. The defendant discharged the gun so that the man would not shoot him, and another man in the apartment was hit by a bullet and killed. This Court reversed the defendant's manslaughter conviction, finding that the trial court erred in not giving a justification charge. The Court found that a reasonable view of the evidence showed that the defendant fired the weapon to protect himself from the imminent use of deadly force by the man who grabbed for his gun (see also People v Smith, 234 AD2d 484, 485 [2d Dept 1996] [justification should have been charged where the victim " lunged' at" and "attempt[ed] to grab" the defendant, who was armed with a gun]).
In arguing that no justification charge was warranted, the People place undue emphasis on Thomas's testimony that defendant was angrier and more aggressive than Cabbagestalk, and that defendant and Cabbagestalk were six to seven feet away from each other. The jury, however, could have disregarded that testimony in favor of Wolf's testimony describing Cabbagestalk as the aggressor, and placing the men only two feet apart when the gun was discharged (see People v Zona, 14 NY3d 488, 493 [2010] ["it is fundamental that a jury may accept portions of the defense and prosecution evidence or either of them"] [internal quotation marks omitted])[FN6]. Moreover, it is undisputed that Thomas, who was looking for her keys during the incident, did not witness the actual shooting, and expressly conceded that she did not know how far away the men were from each other when the shot was fired.
In denying defendant's request for the justification charge, the trial court relied on three cases, all of which are distinguishable. In People v Jones (3 NY3d 491 [2004]), the defendant, who had a considerable height and weight advantage over his girlfriend, choked her to death after "she merely picked up [a] knife" and tried to slap him (id. at 497). In People v Torres (140 [*6]AD3d 478 [1st Dept 2016], lv denied 28 NY3d 974 [2016]), the defendant stabbed two unarmed men in the back, had no reason to believe that the victims or their companions were armed or about to use deadly force, and had the ability to retreat. In People v Taylor (134 AD3d 508 [1st Dept 2015], lv denied 28 NY3d 1075 [2016]), the defendant stabbed two bouncers at a club, and subsequently chased one of them with a knife, even though the defendant had no reason to believe that the victims, or their fellow employees, were using anything more than ordinary physical force. Here, in contrast, defendant discharged his weapon only after a continued assault upon him where Cabbagestalk, who was younger and taller than defendant, advanced upon him, backed him down, threw multiple punches, grabbed at his gun and made what could reasonably be viewed as an overt threat to use the weapon against defendant.
People v Watts (57 NY2d 299 [1982]), relied upon by the dissent, is distinguishable. There, the Court found that a justification charge was not warranted where the "sole probative evidence" was the defendant's statement to a police officer at the time of arrest that "the complainant came after [defendant] in his room with a kitchen knife'" (id. at 302). Notably, there is no description in Watts of the circumstances surrounding the incident, including the defendant's proximity to the victim, or their relative ages and sizes. The proof in Watts stands in stark contrast to the evidence of Cabbagestalk's aggressive behavior here.
The dissent's reliance on People v Hosein (221 AD2d 563 [2d Dept 1995]) is similarly misplaced. In that case, no justification charge was warranted because the defendant had no reason to believe that the victim was about to use deadly physical force against him. Unlike here, the victim in Hosein did not take multiple swings at the defendant, did not try to grab his gun, and made no threatening remarks. Moreover, the victim in Hosein was six to seven feet away from the defendant at the time the defendant fired his gun. Here, in contrast, defendant and Cabbagestalk were only two feet apart when Cabbagestalk grabbed for the weapon, which increased the likelihood that Cabbagestalk could have gotten control of it.
We do not agree with the dissent's view that, as a matter of law, Cabbagestalk employed only "ordinary physical force, not deadly physical force," at the time defendant discharged his weapon. Nor do we agree with the dissent's characterization that Cabbagestalk "made [no] serious effort to grab defendant's firearm." According to Wolf, the only witness who actually saw the shooting, Cabbagestalk was advancing upon defendant and backing him down, while simultaneously swinging multiple times at his face, swiping for the gun and making a threatening statement. A jury could conclude that faced with Cabbagestalk's rapidly escalating violent behavior, defendant reasonably believed that Cabbagestalk was about to use deadly physical force, by gaining control of defendant's gun and using it to shoot defendant.
The natural extension of the dissent's argument is that because Cabbagestalk did not actually take possession of defendant's gun, defendant could not, as a matter of law, reasonably have feared that Cabbagestalk would imminently use deadly physical force. We believe that is a question for the trier of fact. Although, as the dissent points out, there was no physical contact between Cabbagestalk and defendant, a fair view of the evidence, considered in the light most favorable to defendant, shows that Cabbagestalk advanced to within arm's reach of defendant, took multiple swings at his face and tried to take his gun. A jury could reasonably find that defendant did not have to wait until Cabbagestalk actually grabbed the gun before defendant had the right to defend himself.[FN7]
Pointing to select excerpts from the testimony of defendant's expert witness, the dissent opines that, as a matter of law, a reasonable law enforcement officer in defendant's situation would not have drawn and discharged his weapon. Although the expert did testify that law enforcement officers are trained to defuse confrontations, he also emphasized that officers "do[] not have to see a weapon in order to draw [their own] weapon," and acknowledged that the closer an assailant is, the more of a threat they pose. According to the expert, law enforcement officers are trained that if they draw their weapon, and subsequently fear that the weapon could be wrestled away from them, they can discharge the weapon to defend themselves. Although the dissent posits that the expert's testimony "dispels any notion" that defendant had a reasonable belief that his life was in jeopardy, the testimony, viewed in its entirety, presents a question for the jury.[FN8]
The dissent also concludes that defendant was not entitled to a justification charge because he was the first participant in the encounter to threaten the use of deadly physical force. Although not describing it as such, the dissent is essentially arguing that defendant was the initial aggressor as a matter of law (see CJI2d[NY] Justification: Use of Deadly Physical Force in Defense of a Person [defining "initial aggressor" as "the first person who uses, or threatens the imminent use of, deadly physical force"]; People v McWilliams, 48 AD3d 1266, 1267 [4th Dept 2008], lv denied 10 NY3d 961 [2008]). This issue is not properly before us. In their appellate brief before this Court, the People do not contend that the justification charge was not warranted because defendant was the first one to use deadly physical force. Nor do they otherwise rely on the initial aggressor doctrine. Therefore, we should not consider it (see Misicki v Caradonna, 12 NY3d 511, 519 [2009] [courts should decide appeals only on rationales advanced by the parties]).[FN9]
Even if we were to address this argument, we would reject it. The dissent takes the view that, as a matter of law, defendant was the first one to use deadly physical force in the encounter (i.e., defendant was the initial aggressor) because he drew his firearm before Cabbagestalk swiped at the gun. The law, however, does not support the dissent's apparent belief that the mere act of drawing a firearm always constitutes a threat of the imminent use of deadly physical force. "Deadly physical force" is defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00[11] [emphasis added]). Whether or not an act is considered deadly physical force "hinges on the nature of the risk created, its imminence or immediacy, as well as its gravity" (People v Samuels, 198 AD2d 384, 384 [2d Dept 1993], lv denied 82 NY2d 930 [1994]).
Thus, in People v Montanez (17 Misc 3d 126[A], 2007 NY Slip Op 51806[U] [App Term, 2d Dept 2007]), where the defendant exhibited a gun but never pointed it directly at the individuals he believed posed a threat, or cocked the gun, the court found that the defendant "displayed the weapon but never used physical force." Similarly here, the trial evidence shows that when defendant drew his weapon in the midst of Cabbagestalk's attack, he held it by his side, did not point it at Cabbagestalk, and did not threaten him. Based on this evidence, a jury could have reasonably concluded that by drawing his firearm, defendant did not use or threaten the imminent use of deadly physical force.
In arguing that no justification charge was warranted, the dissent places undue emphasis on defendant's displaying his weapon. Taken to its logical conclusion, the dissent's argument is that anytime someone draws a weapon during an encounter with an unarmed individual, he or she is not entitled, as a matter of law, to a justification charge, regardless of what subsequent threatening actions that individual takes. No case in our justification jurisprudence stands for such a sweeping proposition, especially where, as here, the weapon was lawfully possessed.
The dissent's focus on what others in the lobby allegedly thought when defendant had his weapon by his side is misplaced. To begin, no witness ever testified as to what their perceptions were when defendant removed his gun. Although Wolf testified that he started to back up after defendant drew the weapon, he never said that he viewed defendant's conduct as a threat to use to use deadly force. As for defendant's daughter and Cabbagestalk's friend, neither one testified at trial, and thus it would be entirely speculative to try to glean what their perceptions may have been. In any event, the question is not how any of these individuals may have perceived the incident, but whether a jury could have concluded that, at the time defendant fired the weapon, he reasonably believed his actions were necessary to defend himself against Cabbagestalk's imminent use of deadly physical force.
The cases relied upon by the dissent are easily distinguishable. In People v Magliato (68 NY2d 24, 30 [1986]), the Court concluded that "[the] defendant's conduct in drawing [a] pistol, cocking it, holding it with two hands and arms extended, and aiming it at [the approaching victim]" amounted to the use of deadly physical force. Here, defendant engaged in no such threatening behavior and merely held the weapon by his side. Indeed, the Court in Magliato expressly recognized that "[t]he mere display or brandishing of a pistol" could "create an insufficiently imminent threat to life to be considered the use' of deadly physical force" (id.).
People v Berk (217 AD2d 941 [4th Dept 1995], affd 88 NY2d 257 [1996], cert denied 519 US 859 [1996]), People v Dodt (61 NY2d 408 [1984]) and People v Madeo (103 AD2d 901 [*7][3d Dept 1984]) were appeals from convictions after trial or a guilty plea, and have no applicability here. In Berk, where the evidence showed that the defendant confronted the victim with a loaded gun, the Court found that there was a question of fact as to whether the defendant was the initial aggressor. In Dodt, which did not even involve the justification defense, the Court simply found that the defendant's threat to use a gun was legally sufficient to establish that he threatened to use deadly physical force.
In Madeo, which also did not involve justification, the Court merely concluded that the defendant's actions were legally
sufficient under the circumstances to constitute a threat of the immediate use of a dangerous instrument. None of these cases provides any support for the dissent's view that drawing a weapon always constitutes deadly physical force as a matter of law. Moreover, the question of whether evidence supporting a conviction is legally sufficient is entirely distinct from the issue here of whether the proof at trial, viewed in the light most favorable to defendant, would have warranted a justification charge.[FN10]
Because a reasonable view of the evidence supports a conclusion that defendant's actions were justified, the court's failure to charge the justification defense constitutes reversible error (see Padgett, 60 NY2d at 145). We reject the People's position that any such error was harmless. The evidence at trial undeniably established that defendant fatally shot Cabbagestalk, and justification was defendant's sole viable defense. The People's reliance on People v Petty (7 NY3d 277 [2006]) is misplaced. In that case, the victim did not say anything to, or make any threatening gestures towards, the defendant, but instead tried to run away. The Court found harmless error because there was no persuasive evidence that the victim used or was about to use deadly physical force. Here, in contrast, there was no such "overwhelming evidence disproving the justification defense" (id. at 286).
In light of our reversal of the conviction, we need not address defendant's complaints about the prosecutor's summation and the sentencing proceeding.
Accordingly, the judgment of the Supreme Court, Bronx County (Robert A. Neary, J.), rendered November 2, 2016, convicting defendant, after a jury trial, of manslaughter in the first degree, and sentencing him to a term of 18 years, should be reversed, on the law, and the matter remanded for a new trial.
All concur except Gische and Kahn, JJ. who dissent in an Opinion [*8]by Kahn, J.




KAHN, J. (dissenting)


Because I believe that the trial evidence, viewed in the light most favorable to defendant, supported the trial court's denial of defendant's request for a justification charge, I respectfully dissent.
I. Factual and Procedural Background
A. Evidence at Trial
The People's evidence at trial indicated that the shooting in question took place in the common lobby of a double-sided residential building located in the Bronx. Each side of the building has its own street address, 735 East 242nd Street on the west side and 739 East 242nd Street on the east side, along with its own set of mailboxes located in the lobby adjacent to the first floor hallway of each side of the building.
On the day of the shooting, defendant Darryl Brown, a New York City correction officer with a license to carry a gun, lived in apartment 1B on the east side of the building with his adult daughter, Myesha Brown, and her baby. Yvette Flores, who lived across the hallway in apartment 1A, testified that on March 20, 2014, around 12:30 p.m., she was at home when she heard a loud voice arguing in the hallway, looked through the peephole in her door, and saw defendant's daughter, Myesha, who was holding a baby, standing in the open doorway of apartment 1B next to a younger man whom she had never seen before. Flores also saw defendant standing just outside the doorway, facing Myesha and the younger man. Flores heard defendant and the younger man arguing, but could not hear what they were saying. Defendant and the younger man walked out of her line of sight toward the lobby, arguing and cursing, while Myesha remained at the apartment door with the baby, looking upset.
Raymond Wolf, a postal worker, testified that when he entered the building that day and stood at the vestibule door leading into the lobby, two men who were standing in the lobby let him in to deliver the mail. Wolf, who was listening to music with his headphones, had seen one of the two men in the neighborhood before, although he did not know his name or where he lived, and did not recognize the other, younger man. The two men were relaxed and talking. One of the two men was the victim, Vonde Cabbagestalk, and the police later came to believe that the other man, the one whom Wolf recognized, was Cornell or Cardarell Marshall, a friend of Flores's son.
Sheila Thomas, who lived on the fifth floor of the building, was just returning to the building after having gone food shopping. Thomas was standing just outside the vestibule door, facing into the lobby, holding groceries and searching for her keys when she heard voices arguing inside the building. Through the vestibule door windows, she saw an older man, defendant, walk across the lobby from the west side of the building to the east side, followed at a distance of approximately six to seven feet by a taller, younger man, Cabbagestalk. Defendant appeared to Thomas to be very upset, angrier and more aggressive than Cabbagestalk, who "wasn't too upset." Thomas saw Cabbagestalk, who was wearing a coat, holding out both of his hands toward defendant with his palms facing outward, "trying to reason with" defendant. Thomas then saw defendant, followed by Cabbagestalk, continue to walk easterly across the lobby and out of her field of vision. Thomas did not notice a gun in defendant's hand.
At the same time, Wolf was delivering mail at the mailboxes located on the west side of the lobby. He then noticed a shorter, older man, defendant, in the lobby. While the three men were positioned to the east of the building entrance, Wolf saw defendant approach Cabbagestalk and Marshall and heard defendant say, "[S]tay away from my daughter, don't come around here." Defendant and Cabbagestalk began talking, then arguing. Defendant yelled, "[W]hy you here," and Cabbagestalk responded, "[Y]ou can't tell me where to be." Defendant and Cabbagestalk were "getting in each other['s] face[s]" and Cabbagestalk started "trying to back [defendant] [*9]down." Marshall then attempted to separate them, telling Cabbagestalk to "break it up" and "chill out, relax." Cabbagestalk took three swings of his fist toward defendant but did not strike him. Wolf noticed that defendant was holding a gun, which looked "like a police gun." Wolf described defendant as holding the gun in his right hand "at an angle . . . by his body" with his hand just above the height of his waist and his fingers outstretched. Wolf then began to back further away from the men, towards a stairway on the west side of the building. Marshall then stepped toward the back of the building lobby, still trying to tell Cabbagestalk to "relax and chill." Clearly noticing defendant's introduction of the firearm into their dispute, Cabbagestalk, who was at that point standing approximately two feet from defendant, attempted to take one swipe at the gun with his hand, saying, "[Y]ou going to pull a gun out, you better use it." Wolf did not see Cabbagestalk make any physical contact with defendant or his firearm, however. Rather, Wolf saw defendant lean back from Cabbagestalk. Wolf then ascended the stairs on the west side of the building to the first landing, after which he heard a gunshot but could not see the gun being fired. Wolf then called his supervisor.
Meanwhile, Flores had returned to her vantage point at the peephole of her apartment door and observed that defendant's daughter, Myesha, was still standing at the doorway of apartment 1B. She heard Myesha, who was "very upset," yell, "[N]o, daddy, no!" from the doorway, and immediately thereafter heard "a loud boom."
Thomas, who was still standing outside in front of and facing the vestibule door, heard a gunshot, which she thought came from the east side of the lobby. She then saw Cabbagestalk fall backwards and heard a woman scream. Thomas dropped her groceries on the stairs leading to the vestibule door, ran out of the building and called 911.
After hearing the "loud boom," Flores moved away from her door, but then returned "[i]mmediately after," again looked through the peephole and saw defendant, along with Myesha and the baby, enter apartment 1B. Flores called 911. She then opened her door and saw Cabbagestalk lying motionless in front of the lobby door leading to the vestibule.
Wolf returned to the lobby and saw that Cabbagestalk had fallen in the lobby in front of the entrance. Wolf recalled "a lot of people" coming out of their apartments into their hallways. He testified that a woman was screaming while positioned close to where Cabbagestalk was lying on the floor, trying to help him and saying, "[C]all the police." When the police arrived at the crime scene, they recovered a single shell casing from the lobby floor, between the lobby entrance where Cabbagestalk had fallen and defendant's apartment.
The People also introduced into evidence a schematic diagram of the first floor of the building.
Defendant did not testify at trial. Rather, the defense called Robert Baumert, a former officer of the New York City Police Department who later became a security consultant, to testify as an expert witness in the field of tactical uses of force. Much of Baumert's testimony concerned the training of law enforcement officers, including correction officers. In that regard, Baumert testified on cross-examination that law enforcement officers are not trained to shoot people unless "they present a deadly physical force." After Baumert made that statement, the prosecutor inquired, "So, if they don't present a deadly physical force, then you are trained not to shoot them?" and Baumert replied, "Yes." Additionally, Baumert testified that law enforcement officers are trained to "try to de-escalate a situation," by "talk[ing] a person down" and attempting "to stop that person from going any further and escalating the situation where it might turn into a shooting" as a reasonable alternative to use of force. Baumert added that law enforcement officers are trained to know that "a weapon doesn't have to be displayed" by a perpetrator in order for an officer to perceive a threat of use of deadly physical force against them, and that under those circumstances officers may "draw [their] weapon[s] and tell . . . [such perpetrators] not to move, stay where they are and show their hands."
B. Trial Court's Instructions
The trial court denied defendant's request for a justification charge, explaining that there were no issues in this case as to whether defendant had a duty to retreat or was the initial aggressor and that, based on the record, no reasonable person would conclude that defendant was justified in shooting Cabbagestalk. The trial court also denied the People's request to preclude defense counsel from arguing in summation that defendant acted in self-defense, but added that if defense counsel strayed into asking the jury to consider a justification defense, the court would instruct the jury not to consider it because such a defense was not before it. After hearing defense counsel's summation, the court announced that it would not so charge the jury.
During her summation, the Assistant District Attorney told the jury that the court would not instruct the jury on the justification defense because such a defense was not a part of the case before the jury and was not for the jury to consider. The court then gave its instructions to the jury, without including a justification defense charge. Neither of the parties voiced any exception to the court's instructions.
II. Legal Standards
The law of justification sets forth specific and differing rules for the lawful use of force. Insofar as is pertinent to this case, the statute delineates the circumstances under which a defendant may use ordinary physical force or deadly physical force to avert the use of physical force by another actor.
Penal Law § 35.15(1)(b) authorizes the use of ordinary physical force to the extent a person reasonably believes it is necessary for defense against the use or imminent use of unlawful physical force upon oneself or a third person, subject to the provisions of section 35.15(2), unless the actor was the initial aggressor. Penal Law § 35.15(2), which authorizes the use of deadly physical force against another under certain circumstances, provides, in pertinent part:
"A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:
"(a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating; except that the actor is under no duty to retreat if he or she is:
"(i) in his or her dwelling and not the initial aggressor . . . ."
"Deadly physical force" is statutorily defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.10[11]).
The seminal case of the Court of Appeals on the circumstances under which the threatened use of a firearm constitutes a threatened use of deadly physical force is People v Dodt (61 NY2d 408 [1984]). In Dodt, the defendant and the victim were in a parking lot when the defendant grabbed the victim from behind, put his hand over the victim's mouth and used his body to push her across the parking lot toward his car while repeatedly warning, "Don't scream lady, I've got a gun in my pocket" (id. at 412). The defendant never displayed a gun, however (id. at 414). The victim managed to bite one of the defendant's fingers and then screamed, and the defendant fled in his car (id.). The defendant was arrested, tried and convicted of kidnapping in the second degree (id. at 412-413). On appeal, the defendant argued that the proof of abduction by the threatened use of deadly force was insufficient because there was no evidence that he actually possessed a gun during his encounter with the victim (id. at 414). The Court of [*10]Appeals rejected the defendant's argument, finding the threatened use of a gun to be sufficient evidence of threatening to use deadly physical force. As the Court of Appeals explained:
"[T]he threat presented by a gun does not depend to any significant extent on the manner in which it is used. So long as a gun is operable, it constitutes deadly physical force, and a threat to use a gun, such as was made here, can only be understood as a threat that the weapon is operable. In short, on the facts of this case, the evidence was sufficient to establish that defendant restrained [the victim] by threatening to use deadly physical force" (Dodt, 61 NY2d at 414-415 [emphasis added] [internal quotation marks omitted]).
Similarly, in People v Berk (217 AD2d 941 [4th Dept 1995], affd 88 NY2d 257 [1996], cert denied 519 US 859 [1996]), the Appellate Division, Fourth Department, found that the jury properly rejected the defendant's justification claim. There, the Fourth Department explained that the defendant's entry into a room while displaying a loaded gun in plain view of the victims was a sufficient basis for the jury to conclude that the defendant was the initial aggressor, that is, the first to threaten the use of deadly physical force (id. at 942-943, citing People v Magliato, 68 NY2d 24, 28-29 [1986] [drawing cocked and loaded pistol and pointing it at victim constitutes actual "use of deadly physical force within the meaning of Penal Law § 35.15] [emphasis added])[internal quotation marks omitted].
If on any reasonable view of the evidence the jury might have decided that a defendant's conduct was justified, the failure to so charge constitutes reversible error (People v Padgett, 60 NY2d 142, 145 [1983]). In considering "whether a particular theory of the defense should have been charged to the jury, the evidence must be viewed in the light most favorable to the defendant" (People v Farnsworth, 65 NY2d 734, 735, [1985]). While the issue of justification is most often introduced by the defendant, "the prosecution's case, in and of itself, may raise an issue of fact as to whether the defendant was justified in using force such that his or her conduct was entirely lawful" People v Singh, 139 AD3d 761, 763 [2d Dept 2016], lv denied 28 NY3d 936 [2016]). Where evidence supporting the defense of justification has been presented, the People must disprove that defense beyond a reasonable doubt (People v McManus, 67 NY2d 541, 543 [1986]).
In determining whether a defendant is entitled to a charge of justification in the use of physical force in defense of a person under Penal Law § 35.15, the Court must initially determine the type of force that the defendant used. The result of this inquiry will govern whether the provisions of Penal Law § 35.15(1) (ordinary physical force) or of Penal Law § 35.15(2) (deadly physical force) are applicable.
Once the type of force used has been determined, the Court should next utilize a two-step inquiry set forth by the Court of Appeals to determine whether a defendant's conduct was justified. First, it must be ascertained whether the defendant actually believed that deadly physical force was necessary to avert an imminent use of deadly physical force by another actor (the subjective aspect of the justification defense). If the People fail to prove beyond a reasonable doubt that the defendant did not actually believe that the use of deadly physical force was necessary to avoid the use of such force by the other actor, then it must be determined whether, in light of all of the circumstances facing the defendant, a reasonable person in the defendant's circumstances would have used deadly physical force (the objective aspect) (People v Wesley, 76 NY2d 555, 559 [1990]; People v Goetz, 68 NY2d 96, 115 [1986]). In making a determination whether defendant's actions were objectively reasonable, among the circumstances to be considered are the physical attributes of those involved in the incident and any prior experiences that the defendant may have had which could provide a reasonable basis for a belief that another person's intentions were such that the use of deadly force was necessary (Wesley, 76 [*11]NY2d at 559; Goetz, 68 NY2d at 114).
Even where an individual reasonably believes that deadly physical force is necessary to avert the imminent use of deadly physical force by someone else, however, the statute provides, to the extent relevant here, that a defendant may not use deadly physical force if he or she knows that with complete safety to oneself and others, he or she may avoid the necessity of doing so by retreating (Matter of Y.K., 87 NY2d 430, 433 [1996]), unless the defendant is not the initial aggressor and is in his or her dwelling (Penal Law § 35.15[2][a][i]).
III. Discussion
A. Refusal to Instruct on Justification Defense
Defendant's drawing of his gun in the course of his confrontation with Cabbagestalk constituted the threatened use of deadly physical force (see People v Dodt, 61 NY2d at 415; People v Berk, 217 AD2d at 942). Accordingly, the statutory provisions pertaining to the use of such force are those that are properly applicable here (see Penal Law § 35.15[2]).
Employing the two-step inquiry rubric set forth in Wesley and Goetz, it must first be ascertained whether the record provides any evidentiary support for the subjective aspect of the justification defense. I find that the record is devoid of any evidence supporting the view that at the time defendant introduced deadly physical force into the altercation, by drawing his firearm, he actually believed he was in danger of being subjected to deadly physical force by Cabbagestalk, and that his use of deadly physical force was necessary to avert Cabbagestalk's imminent use of such force (see People v Sparks, 29 NY3d 932, 934 [2017]).
Instructive is the Court of Appeals analysis in People v Watts (57 NY2d 299 [1982]). There the defense proffered the defendant's own statement, made at the time of his arrest, that the woman he shot had "[come] after [him] in his room with a kitchen knife" (id. at 302). The Court of Appeals found that that evidence, which is similar to defendant's suggestion here that Cabbagestalk was endeavoring to grab his gun, did not warrant a jury charge on the defense of justification because "[i]t provides no basis for determining whether defendant reasonably believed that he was in imminent danger of being subjected to deadly physical force" (id.). The Court of Appeals pointed out the "sharp contrast" between the evidence before it in Watts and that presented in People v Torre (42 NY2d 1036 [1977]), where there was testimony of both the defendant and an eyewitness detailing that the victim was the first to introduce the use of deadly force into the controversy (Watts, 42 NY2d at 302 n, citing Torre, 42 NY2d at 1036-1037).
This case is far closer to Watts than to Torre, and presents an even stronger rationale for finding no evidentiary support for the subjective aspect of the justification charge. According to Flores's trial testimony, Cabbagestalk and defendant argued at defendant's apartment doorway and then walked together towards the lobby. Wolf saw both men in the lobby as they continued their dispute. Wolf observed Cabbagestalk backing defendant across the lobby, swinging with his fists at defendant's face so aggressively that Marshall held Cabbagestalk back and attempted to calm him down. After Wolf observed Cabbagestalk swinging his fists, he then saw that defendant was holding a gun in his right hand.
Notwithstanding the testimony regarding Cabbagestalk's aggressive conduct toward defendant, there is no record evidence whatsoever demonstrating that at any time from the beginning of the altercation at the doorway of defendant's apartment to the moment that, following Cabbagestalk's swinging of his fists, defendant decided to draw his gun, Cabbagestalk had any access to, threatened the use of, or was about to use, deadly physical force against defendant. There is no evidence that Cabbagestalk was ever armed with a deadly weapon. Indeed, neither Thomas nor Wolf saw Cabbagestalk holding anything in his hands. In fact, Thomas testified that when she saw Cabbagestalk following defendant from a distance of approximately six to seven feet, Cabbagestalk was holding out both of his hands toward [*12]defendant with his palms facing outward, "trying to reason with" defendant. And although Thomas testified that Cabbagestalk was wearing a coat at the time of the incident, neither she nor Wolf claimed to have seen the outline of a gun, knife or other deadly weapon on the coat, or claimed that Cabbagestalk appeared to be clutching any object concealed in his coat. When defendant became the first and only participant in the altercation to threaten the use of deadly physical force (see People v Dodt, 61 NY2d at 415; People v Berk, 217 AD2d at 942), he did so without any basis for fearing that Cabbagestalk was about to use such force on him.
Additionally, defendant's own expert testified that law enforcement officers are trained to first try to defuse any situation that might turn into a shooting by talking the person down and attempting to stop the person from going any further and to keep the situation from escalating into the use of force. This testimony dispels any notion that defendant could have harbored any actual subjective belief, whether before or after he displayed his gun, that he needed to shoot Cabbagestalk in order to avert Cabbagestalk's grabbing his service firearm away from him, pointing it at defendant and shooting him (see People v Goetz, 68 NY2d at 114-115).
In any case, even if there were a reasonable doubt as to defendant's subjective belief that the use of deadly physical force was necessary to avert Cabbagestalk's use of such force, there was no reasonable view of the evidence that a reasonable, objective person in defendant's circumstances would have believed that use of deadly physical force was necessary to avert the imminent use of deadly physical force by Cabbagestalk against him.
Although Wolf testified that Cabbagestalk made three swings of his fist toward defendant and a single swipe at the gun once defendant drew it, neither he nor Thomas saw Cabbagestalk make any physical contact with defendant or the gun. More plausibly, Cabbagestalk's swipe at defendant's gun, given defendant's positioning it at his waist level, along with Cabbagestalk's statement, "[Y]ou going to pull a gun out, you better use it," could only reasonably and objectively be viewed as Cabbagestalk's only available defensive response to defendant's introducing the threat of deadly physical force into the altercation. Cabbagestalk neither produced his own weapon, nor made any serious effort to grab defendant's firearm away from him, as his one-time swipe at the gun was at a distance of two feet and he never made physical contact with defendant or his weapon. There is absolutely no record evidence of any indication of Cabbagestalk's imminent use of deadly physical force that would require defendant's use of his gun in self-defense (see People v Hosein, 221 AD2d 563, 564 [2d Dept 1995] [no justification charge warranted as to defendant who shot an unarmed victim where the defendant has no reason to believe the victim had a weapon or was about to use deadly physical force and could have retreated in safety]). Indeed, had Cabbagestalk managed to grab defendant's gun and discharge it, and face prosecution for injuring defendant, Cabbagestalk credibly could have argued that he did so in self-defense, and would have been entitled to a justification charge. Therefore, defendant's argument that he reasonably believed that his use of his gun to shoot Cabbagestalk was necessary to defend himself from Cabbagestalk's imminent use of deadly physical force is supported by "nothing but speculation" (People v Garcia, 59 AD3d 211, 212 [1st Dept 2009], lv denied 12 NY3d 853 [2009] [in assault case where the defendant's stepson's single striking of the defendant with his hand was followed by the defendant's striking his stepson's head and shoulder with a claw hammer, trial court properly denied the defendant's request for a justification charge where the defendant's argument that his use of deadly physical force against his stepson was based on his belief that his stepson was armed and that his wife was about to join the attack was grounded on nothing other than speculation as to both the objective and subjective aspects of that defense]).
Viewing the evidence regarding Cabbagestalk's conduct in the light most favorable to defendant, Cabbagestalk's repeated swinging at defendant and his swipe at defendant's gun on one occasion could be seen, at most, as an effort to intentionally place defendant in fear of [*13]imminent harmful or offensive contact, but by the use of ordinary physical force, not deadly physical force. Accordingly, I find that, viewed in the light most favorable to defendant, an objectively reasonable person in defendant's circumstances would harbor no belief that the use of deadly force was necessary to avert the imminent use of deadly physical force by Cabbagestalk.
Neither would it be objectively reasonable for a trained law enforcement officer in defendant's situation even to draw a firearm, much less use it, when faced with a man such as Cabbagestalk, who was unarmed and taking swings toward defendant without making physical contact. With respect to the determination of the reasonableness of a defendant's belief in the necessity for use of deadly physical force, the Court of Appeals has explained:
"The critical focus must be placed on the particular defendant and the circumstances actually confronting him at the time of the incident, and what a reasonable person in those circumstances and having defendant's background and experiences would conclude" (People v Wesley, 76 NY2d at 559, citing 1 CJI[NY] PL 35.00, Introductory Comment, at 848-849).
The Court of Appeals has further instructed that the experiences of a defendant to be considered include "any prior experiences that the defendant may have had which could provide a reasonable basis for a belief that another person's intentions were to injure or rob him or that the use of deadly force was necessary'"
(Wesley, 76 NY2d at 559, quoting People v Goetz, 68 NY2d at 114).[FN1]
Here, as defendant's own expert witness, Baumert, testified, law enforcement officers such as defendant are trained that they should always attempt to de-escalate a confrontational situation such as this one without resorting to drawing a gun. Thus, a reasonable law enforcement officer confronted with defendant's situation would not have drawn a firearm or used deadly physical force against Cabbagestalk.
The majority extracts from Baumert's testimony his statement that an officer "does not have to see a weapon in order to draw his weapon." This statement was made in the context of Baumert's overall testimony as to what a law enforcement officer is trained to do when confronting a person who is either carrying a deadly weapon in plain sight or taking actions suggesting that person's possession of a concealed weapon, however. Specifically, Baumert's testimony referred to what an officer is trained to do when confronting a person who is either "armed and that arm is visible in that person's hand" or who is perceived by the officer to be threatening the use of deadly physical force by "making some kind of gesture" such as "putting [*14][one's] hand inside [one's] pocket," thereby suggesting that the person is carrying a concealed weapon.
Baumert testified that in situations where an officer is confronting a person displaying a weapon in plain sight, the officer is trained to command that person to "put the weapon down[,]" to "[p]lace the weapon at your feet" and to "[s]tep away from it." Baumert further stated that lack of time may impact on the ability to issue such commands in situations where a person is "approaching." Baumert further testified that in situations where officers perceive threats without actually seeing a weapon and draw their own weapons, officers are trained to tell such threatening individuals "not to move, stay where they are and show their hands."
Neither of the scenarios described by Baumert was presented in this case, however. Here, Cabbagestalk advanced toward defendant with both his hands out of his pockets and outstretched, and then swung his fists toward defendant. There is no evidence that at any time during their confrontation Cabbagestalk was seen holding a weapon in plain sight or that he made any gesture, such a putting a hand in his pocket, suggesting that he was carrying a concealed weapon. Moreover, there is no evidence that defendant ever tried to de-escalate the situation in accordance with his training, or took any of the measures an officer is trained to take, and an objectively reasonable correction officer would have taken, before drawing his weapon and shooting Cabbagestalk.
Indeed, the record reveals that defendant acted in a manner entirely contrary to that dictated by his own training and experience. Specifically, after his initial confrontation with Cabbagestalk at the doorway of his apartment, rather than returning to the safety of his apartment, defendant walked away from it, toward the building's lobby, armed with a loaded gun. Upon entering the lobby, he continued to argue with Cabbagestalk, and then escalated the intensity of their encounter by being the first, and only, participant to introduce a firearm and deadly physical force into the confrontation. Even as Cabbagestalk began swinging his fists at defendant, defendant was not authorized by law to respond to Cabbagestalk's use of ordinary physical force by introducing the threat of deadly physical force into the situation (see Penal Law § 35.15[2]).
The majority is certainly correct in stating that the display of a firearm does not always constitute a threat of deadly physical force. For example, a person's display of a licensed firearm for the purpose of informing another person what type of firearm she is carrying or to explain its physical features or workings would not necessarily constitute a threat of use of deadly physical force. This case does not present an instance of a display of a firearm for informational purposes, however.
Rather, this case involves defendant's display of a firearm as a means to convey to Cabbagestalk defendant's threat to use deadly physical force against him. In an analogous circumstance, with regard to what constitutes a "display" of a firearm in the context of a first degree robbery case (see Penal Law § 160.15[4] [robbery involving display of what appears to be a firearm]), the Court of Appeals has provided guidance by explaining that "the display requirement has been construed broadly to cover a wide range of actions which might reasonably create the impression in the mind of the victim that the robber is armed with a firearm" (People v Lopez, 73 NY2d 214, 220-221 [1989]). In such cases, even the partial display of a firearm by a defendant has been held to be not only sufficient to meet the "display" requirement for first degree robbery, but also to constitute a threat of the use of deadly physical force. In People v Madeo (103 AD2d 901, 902 [3d Dept 1984]), the Appellate Division, Third Department, affirmed the defendant's first degree robbery conviction, holding that the "defendant's statement that he had a gun and his partial display thereof are sufficient under the circumstances to constitute a threat" of use of deadly physical force. In doing so, the Third Department rejected the defendant's argument that his actions did not constitute a threat because he neither used any express words of threat nor brandished his gun. Rather, the Third Department analogized the case before it to People v Dodt, in which the Court of Appeals upheld a first degree kidnapping conviction, reasoning that the defendant's statement in that case that he had a gun was sufficient to convey an implied threat that the defendant would use an operable weapon and to establish the "threatening to use deadly physical force" requirement of the first degree kidnapping statute (Penal Law § 135.25), even though no gun was even partially displayed in that case (see Dodt, 61 NY2d at 415; Madeo, 103 AD3d at 902; Berk, 217 AD2d at 942).
In this case, defendant displayed a loaded, operable firearm by unholstering it and holding it at his side at waist height. In displaying his service firearm in this manner at relatively close range to the unarmed Cabbagestalk, defendant unquestionably intended to convey to Cabbagestalk the implied threat that defendant would use deadly physical force against him (see Dodt, 61 NY2d at 415; Madeo, 103 AD3d at 902; Berk, 217 AD2d at 942). Indeed, each of the four people who witnessed him doing so perceived him as threatening the use of deadly physical force against Cabbagestalk. Cabbagestalk, upon seeing defendant holding the gun, stated, "[Y]ou going to pull a gun out, you better use it," and attempted to swipe it away. Wolf, upon seeing defendant with a firearm in his hand, immediately backed up the stairway on the west side of the building to its first landing, abandoning his mail delivery duties in search of a safe refuge. Myesha Brown, according to Flores's testimony, stood at the doorway of the apartment looking very upset and yelled, "[N]o, daddy, no!" immediately before the shot was fired. Even Marshall stepped toward the back of the lobby, away from the two men. Clearly, the defensive actions of every witness to defendant's drawing his gun make clear that each of them perceived defendant's holding his gun as a threat to use deadly physical force, and not as an informational display of the weapon.
Furthermore, in determining whether defendant's display of his service firearm constituted a threat of deadly physical force, it is of no moment that the gun was not aimed at Cabbagestalk at the moment he displayed it. The evidence clearly indicates defendant fired his loaded weapon at Cabbagestalk shortly after displaying it, making clear his prior intent (see People v Joyce, 150 AD3d 1632, 1634 [4th Dept 2017]).
In support of its contrary view, the majority cites People v Montanez (17 Misc 3d 126[A], 2007 NY Slip Op 51806[4] [App Term, 2d Dept 2007]), a decision in which the Appellate Term upheld the trial court's denial of a justification charge pursuant to Penal Law § 35.15, as occurred in this case. In Montanez, therefore, no basis was found for a charge of justification in self-defense. Rather, in Montanez, the Appellate Term held that the only ground for granting a justification charge was Penal Law § 35.05(2), the emergency doctrine. Under that doctrine, the use of physical force which would otherwise constitute a criminal offense is justifiable as the lesser of two evils, that is, when necessary as an emergency measure to avoid an imminent public or private injury of even greater magnitude. Here, in contrast to Montanez, there is not a scintilla of evidence that defendant's deployment of his gun was perceived as the lesser of two evils, necessary as an emergency measure to avoid an imminent and more serious public or private injury. In any event, in this case defendant never requested a justification charge based upon the emergency doctrine.
The majority's argument that a jury could conclude that defendant had a reasonable fear that Cabbagestalk would gain control of the gun because he was younger and taller than defendant misses the mark. A comparison of the ages and sizes of Cabbagestalk and defendant is merely one consideration in determining whether defendant had a reasonable fear of Cabbagestalk's imminent use of deadly physical force (see People v Wesley, 76 NY2d at 559). Wesley also requires consideration of "any prior experiences that the defendant may have had [*15] which could provide a reasonable basis for a belief that . . . the use of deadly force was necessary'" (id., quoting People v Goetz, 68 NY2d at 114).
Here, as previously discussed, as defendant's own expert witness testified at trial, law enforcement officers such as defendant are trained, even when faced with a threat of deadly force, to attempt to de-escalate the situation. Thus, based on his own experience as a correction officer, defendant knew from his training how to de-escalate the tension of the situation and avoid exacerbating it. The "critical focus" required by Wesley (76 NY2d at 559) must here be placed on what a trained correction officer would reasonably have done in the circumstances, notwithstanding the respective physical attributes of defendant and Cabbagestalk.
The majority argues that the jury could have found that defendant reasonably feared that Cabbagestalk would use deadly physical force against him because defendant and Cabbagestalk were within two feet of each other at the time of the shooting. None of the witnesses had the participants in view at the time that defendant discharged his weapon, however. And although a jury is entitled to accept some portions of defense and prosecution evidence while rejecting others (see People v Zona, 14 NY3d 488, 493 [2010]), it may not arbitrarily dissect the integrated testimony of a single witness, such as Wolf or Thomas (see People v Scarborough, 49 NY2d 364, 373-374 [1980]).
The majority also contends that defendant did not have to wait until Cabbagestalk actually grabbed the gun before using deadly physical force. This argument inverts the statutory requisites for the use of deadly physical force in self-defense. As previously established, no reasonable view of the evidence supported the view that Cabbagestalk was the first to threaten the use of deadly physical force.
In sum, viewed in the light most favorable to defendant, there is no reasonable view of the evidence to support either the subjective or objective aspects of the justification defense (see People v Goetz, 68 NY2d at 114-115), as there is no reasonable view of the evidence that defendant believed, or had reason to believe, that Cabbagestalk was using or was about to use anything more than ordinary physical force against him at the time he brought out his gun. As there was no reasonable view of the evidence that defendant's use of deadly physical force was justified, the trial court's ruling denying defendant's request for a charge of justification for his use of deadly physical force was correct.[FN2]
B. Prosecutorial Misconduct
Defendant, who failed to object during the summation, and who also declined any remedy after making a belated postsummation objection, failed to preserve his claim that the prosecutor committed misconduct by arguing to the jury that justification was not "a part of this case," after the court had declined to give the jury an instruction to that effect. I would, therefore, decline to review it in the interest of justice. Alternatively, I would find that the challenged remarks did not deprive defendant of a fair trial (see People v Rodriguez, 52 AD3d 399 [1st Dept 2008], lv denied 11 NY3d 834 [2008], see also People v. D'Alessandro, 184 AD2d 114, 118-119 [1st Dept 1992] lv denied 81 NY2d 884 [1993]).
C. Excessive Sentence
Because defendant's contention that the court sentenced him on the basis of misinformation is not supported by the record, I would conclude that there is no basis for reducing the sentence. Accordingly, I would affirm the judgment of the Supreme Court.
Judgment, Supreme Court, Bronx County (Robert A. Neary, J.), rendered November 2, 2016, reversed, on the law, and the matter remanded for a new trial.
Opinion by Richter, J.P. All concur except Gische and Kahn, JJ. who dissent in an Opinion by Kahn, J.
Richter, J.P., Gische, Kapnick, Kahn, Kern, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: FEBRUARY 20, 2018
CLERK



Footnotes

Footnote 1: In the course of their investigation, the police came to believe that the third man in the lobby was Cordarell Marshall. Marshall was questioned by police on the day of the shooting, and told them that he did not see or hear anything. Although the police took pedigree information from him, they subsequently were unable to locate him.

Footnote 2: Robert Baumert, a security consultant and former firearms instructor for the New York City Police Department, testified as an expert witness for the defense about the tactical use of force by law enforcement officers. Defendant did not testify.

Footnote 3: The court did not submit the criminal use of a firearm count to the jury.

Footnote 4: The People do not argue on appeal that this issue is unpreserved. Although, as the dissent notes, defendant did not object after the court instructed the jury, the issue was fully preserved by defendant's earlier request for the justification charge. Defendant was not required to renew his request after the jury was instructed (CPL 470.05[2]; People v Le Mieux, 51 NY2d 981, 982 [1980]; see People v Mezon, 80 NY2d 155, 161 [1992] ["The law does not require litigants to make repeated pointless protests after the court has made its position clear"]). 

Footnote 5: The testimony of Flores and Thomas sheds no light on the critical event. Flores conceded that she did not see the actual shooting, and Thomas testified that the two men were out of her view when the shot went off.

Footnote 6: The dissent's contention that Wolf did not have the participants in view when the shot was fired is not supported by the record. Contrary to the dissent's suggestion, Wolf did not testify that he did not witness the shooting. Although Wolf did not actually see the flash from the gun, he observed defendant retreating from Cabbagestalk's swings at the precise moment the shot went off, and saw Cabbagestalk fall to the ground immediately thereafter. The only fair reading of this testimony is that Wolf witnessed the actual shooting.

Footnote 7: The dissent's belief that Cabbagestalk himself would have been entitled to a justification charge if he had grabbed defendant's gun and shot him is irrelevant because that hypothetical scenario is not before us. Similarly, the dissent's observation that defendant's possession of the weapon could constitute criminal conduct if he were not a correction officer has no relevance to whether his actions were justified in this homicide prosecution.

Footnote 8: It is difficult to understand how the issue of de-escalation, which is in the dissent's discussion about the expert testimony, has any bearing on the issues on appeal. Although this might have some relevance to whether defendant was the initial aggressor or had a duty to retreat, those issues are not before us.

Footnote 9: The initial aggressor issue is also unpreserved. The record on appeal does not show that the People below relied on this doctrine in opposing the justification charge (see People v More, 97 NY2d 209, 214 [2002] [arguments raised by the People for the first time on appeal are unpreserved]). Nor did the trial court "expressly decide[]" this issue in refusing to instruct the jury on justification (CPL 470.05[2]; see People v Miranda, 27 NY3d 931, 932 [2016] [arguments not preserved where the court "did not expressly decide, in response to protest, the issues now raised on appeal"]). Indeed, in denying the justification charge, the court stated, "We have none of that in this case, the issue of who the initial aggressor [was]." Contrary to the dissent's view, the only reasonable interpretation of the court's statement is that it did not rely on the initial aggressor doctrine in declining to give the justification charge.

Footnote 10: We do not agree with the dissent's belief that, as a matter of law, defendant could have safely retreated into his apartment. As the dissent recognizes, the People do not argue that defendant failed to satisfy his duty to retreat. Because the record on appeal does not show that the People relied on this doctrine below, and the court did not expressly address it, it is unpreserved. In any event, a jury could have reasonably concluded that defendant did not know that he could with complete safety to himself and others have avoided the necessity of using deadly physical force by retreating (see Penal Law § 35.15[2][a]). In view of the proximity of the two men, with Cabbagestalk within arm's reach of defendant's weapon, we cannot say, as a matter of law, on the record before us, that defendant knew that he could have safely retreated.

Footnote 1: In applying the Wesley standard of inquiry as to whether a reasonable person in defendant's circumstances would have used deadly physical force, it is therefore appropriate to consider defendant's status as a correction officer. This is so not only because defendant himself found that circumstance germane in offering Baumert's testimony, but also because, realistically, it would be impossible to separate defendant from his own knowledge, training and experience as a correction officer. Moreover, were defendant not an active correction officer licensed to carry a concealed pistol or revolver (see Penal Law §§ 265.20[3], 400.00[2][e]), his carrying of a loaded firearm into the lobby would have constituted, at minimum, a class C violent felony (see Penal Law § 265.03[3]).

Footnote 2: On this appeal, the People have not raised issues as to who was the initial aggressor and whether defendant had a duty to retreat, although the trial judge's ruling denying a justification charge employed language which could be interpreted as addressing both concerns ("We have none of that in this case, the issue of who the initial aggressor [was] and duty to retreat. All of that factors into my thinking there is no reasonable person who will say the defendant was justified based on the record as it stands now." The issue of which party first threatened the use of deadly physical force has been addressed in the Goetz-Wesley analysis already discussed. Additionally, the trial record is uncontroverted, based on the testimony, the police diagram of the location of the parties during the incident and the location of the shell casing, that at the time of the shooting, nothing prevented defendant's retreat with safety to his own apartment, a few feet away (cf. Matter of Ismael S., 213 AD2d 169, 172 [1st Dept 1995] [the defendant was surrounded by group of men larger than himself and had "no means to extricate himself"]; People v Schwartz, 168 AD2d 251 [1st Dept 1990] [on emerging from bathroom, the defendant was jumped by man grabbing for his gun]).